Bryant Heater Company, an Ohio Corporation v. Commissioner. Dresser Industries, Inc., a Pennsylvania Corporation, Transferee of the Assets of Bryant Heater Company v. Commissioner.
Bryant Heater Co. v. Commissioner
Docket Nos. 39188, 39189.
United States Tax Court
T.C. Memo 1954-201; 1954 Tax Ct. Memo LEXIS 44; 13 T.C.M. (CCH) 1059; T.C.M. (RIA) 54307; November 25, 1954, Filed A. W. Whitehouse, Jr., Esq.; C. F. Taplin, Jr., Esq., 1500 Midland Building, Cleveland, Ohio; D. H. Larmee, Esq., for the petitioners. James F. Kennedy, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income taxes against petitioner Bryant Heater Company and against petitioner Dresser Industries, Inc. as transferee of Bryant Heater Company as follows: Year
Deficiency
Taxable year ended October
31, 1948
$ 1,633.04
November 1, 1948 - February
28, 1949
124,142.70 A claim for overpayment *45 has also been made. Petitioners do not contest certain adjustments. A partial concession has also been made by respondent. The remaining issues are (1) whether petitioner Bryant Heater Company is entitled to take a substituted basis with respect to certain properties acquired from its predecessor company by a transfer consummated on July 1, 1933 for purposes of determining its depreciation allowance and the amount of gain upon the sale of its assets during the periods in controversy herein; (2) whether respondent properly allocated the profit made by petitioner Bryant Heater Company in the periods in controversy from the sale of its assets between ordinary income attributable to inventory and long-term capital gain attibutable to its other assets; (3) whether petitioner Bryant Heater Company was entitled to deductions for accrued state taxes in excess of those originally allowed by respondent; (4) whether petitioner Bryant Heater Company was entitled to a loss deduction for the short taxable period in controversy under section 23(f), Internal Revenue Code of 1939, with repect to certain organizational expenses incurred in 1933. Findings of Fact Some of the facts have been stipulated *46 and are found accordingly. Petitioner Dresser Industries, Inc., a successor of S. R. Dresser Manufacturing Company, both hereinafter sometimes referred to as Dresser, is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. Its principal office is located in Bradford, Pennsylvania. Petitioner Bryant Heater Company, hereinafter sometimes referred to as petitioner or New Bryant, during the years here involved was a corporation duly organized and existing under the laws of the State of Ohio. Its principal office was located in Cleveland, Ohio. The income tax returns of New Bryant for the periods in controversy were filed with the collector for the eighteenth district of Ohio. New Bryant's predecessor in business was the Bryant Heater and Manufacturing Company, hereinafter referred to as Old Bryant, which was incorporated in 1911. Old Bryant had previously been operated as an unincorporated business since 1904. The first tubular gas boiler was designed in 1908. During the spring of 1933 and for many years prior thereto, Old Bryant was engaged in the manufacture and sale of gas-fired central heating equipment, primarily gas-fired boilers. *47 It was a pioneer in this field. Old Bryant was a closely-held corporation, with only common stock outstanding. Its directors owned or controlled approximately 83 per cent of the common stock. All 7 directors, with the exception of O. C. Frary, were full-time employees of Old Bryant. Frary was the company's dealer in Chicago. Old Bryant did not manufacture a diversified line of products, and the products which it did make were in the category of luxury items. In the spring of 1933, the market trend was away from gas-fired boilers and toward warm-air furnaces. The earnings of Old Bryant reached their peak in 1926, and after 1930 it sustained increasing losses. In the spring of 1933 the country was undergoing a severe economic depression. Although Old Bryant did not shut down completely, a large part of its working force was laid off. The Union Trust Company of Cleveland, Ohio, hereinafter called Union Trust, held a large amount of discounted dealers' notes on which Old Bryant was liable as endorser. It had been the practice of Old Bryant to accept notes from its dealers for past due accounts for merchandise shipped to them. In turn, these notes were endorsed and discounted with *48 banks by Old Bryant. On June 15, 1933, Old Bryant was obligated to Union Trust in an amount of $254,549.50, by reason of its endorsement on these discounted dealers' notes. Of the notes that were held by Union Trust, $163,600 had been pledged with the Federal Reserve Bank of Cleveland. All of the above notes were in default by the original makers thereof and collection from the makers was hopeless. In the spring of 1933, Union Trust was in financial difficulties and its affairs were in the hands of a conservator appointed by the State of Ohio. The conservator was charged with the responsibility of collecting and liquidating the assets of the bank, including the dealers' discounted notes mentioned above. A. C. Coney worked under the conservator in handling these notes. After the first of the year 1933, Lyle C. Harvey, sales manager and a director of the company, sought to find parties who might be interested in a reorganization of Old Bryant. At the March 14, 1933 meeting of the board of directors, Messrs. Frary, Fox, Harvey and Orth were appointed to consult with Union Trust about a reorganization or refinancing program. The directors and stockholders of Old Bryant individually, *49 and through Harvey, as agent, also sought to interest a number of outside parties in financing or reorganizing Old Bryant. After the reorganization Harvey became vice president of New Bryant while at the same time the other employee-stockholders of Old Bryant were retained in positions inferior to those formerly held. Harvey did not advertise Old Bryant as being for sale. After several weeks of attempting to find interested parties Harvey contacted Dresser's president, Henry Mallon. Dresser was and is primarily engaged in the manufacture and sale of couplings for water and gas mains and for oil and gas pipelines. In 1933, Dresser was seeking to diversify its activities. Because of technical changes, chiefly the development of welding processes, its pipe couplings business was falling off. Dresser's activities prior to that time had made it familiar with the attempts of gas companies to promote the use of gas appliances in order to market the gas made available by the tremendous pipeline expansion that had taken place in the latter 1920's. The promotional activities of these gas companies made the gas appliance industry attractive to Dresser. In the latter part of March 1933, *50 after becoming aware of Old Bryant's desire to reorganize, Dresser commenced to make an extensive and thorough investigation of that company in order to determine whether it would be interested in participating in a plan of reorganization and, if so, on what terms. As a result of this investigation, Mallon, accompanied by the chairman of the board of directors of Dresser, named Miller, entered into negotiations with the directors of Old Bryant. The directors of Old Bryant were assisted in their negotiations with Dresser and other parties by Paul Bickel. Bickel had been Old Bryant's attorney for some time, and he took an active part in the negotiations. Dresser was represented by its counsel, McAfee. Negotiations between Old Bryant and Dresser were carried on intensively for a period of several months. During this period of negotiations with Dresser, Old Bryant continued its search for and negotiations with other possible parties. After an initial written proposal had been made to Old Bryant's directors by Dresser on May 8, 1933, the parties continued to discuss the proposed terms and to make changes therein. To meet Bickel's objection, Dresser's proposal was revised so that the *51 dividend rights of the preferred stock in the proposed new company, which was to be organized to take over and continue the business of Old Bryant, were made cumulative after January 1, 1936. In return the dividend rate of that stock was cut from 7 per cent to 6 per cent. Dresser's revised proposal was recommended to the shareholders of Old Bryant by its board of directors at their meetings on May 23, 1933 and May 26, 1933. A decision on Dresser's revised proposal was not made at the shareholders' meeting of May 23, 1933. There was a possibility that a more favorable proposal could be obtained from another interested party. As a result the meeting was adjourned to May 26, 1933. On the latter date, the Dresser offer of reorganization was unanimously approved by the Old Bryant shareholders. Prior to the spring of 1933, Harvey and Mallon had never met one another. There existed no stock control between or among Old Bryant and Dresser, their subsidiaries or their shareholders. There were no officers or directors common to both companies. The two companies were not in direct competition with one another, nor were the products of one company usable by the other in its manufacturing processes. *52 Dresser was not a creditor of Old Bryant prior to June 15, 1933. While negotiations with Dresser were going on the representative of Union Trust, which held the bulk of the Old Bryant dealers' notes, indicated an intention to take necessary steps for collection. Concurrently with the negotiations between Dresser and Old Bryant, Mallon, as president of Dresser, negotiated with Coney for the purchase of dealer notes from the conservator of Union Trust. The negotiations between Mallon and Coney were conducted at arm's length. There was no favoritism shown to Dresser. Each party was seeking the best terms possible. The conservator sought to realize the maximum on the notes through whatever method seemed most promising. It would include putting a company through bankruptcy or carrying it along or participating in a reorganization. As the result of these negotiations, which began in April 1933, Dresser offered to purchase all of the Old Bryant dealers' notes in the hands of the conservator, including those pledged to the Federal Reserve Bank, for $65,000 in cash. This offer was approved by the Federal Reserve Bank, accepted by the conservator and acquiesced in by the Superintendent *53 of Banks of Ohio. The sale was consummated on June 15, 1933. The principal stockholders of Old Bryant did not know until sometime after July 1, 1933, that the dealers' notes had been purchased for $65,000. At the time of the Dresser negotiations with Old Bryant many of the stockholders owed unpaid balances on their stock subscriptions, but the subscriptions of the principal stockholders had been paid in full. The Dresser proposition included the provision that the obligations on unpaid amounts would be the provision that the obligations on unpaid amounts would be cancelled. At one of the stockholders' meetings at which the Dresser proposal was under consideration, the stockholders were told that unless they acceded to Dresser's offer they might lose their homes and other property. At the time the Dresser offer was accepted the Borg-Warner Company was considering making a proposal to Old Bryant and to this end had solicited financial and operating data from the company. The substance of the agreement of May 26, 1933 between Old Bryant and Dresser was that Dresser would cause a new corporation New Bryant, to be organized with an authorized issue of capital stock consisting of *54 5,000 shares of 6 per cent preferred stock with a par value of $25 per share and 500 shares of no-par common stock. The preferred stock was to be nonvoting, and nonparticipating in profits beyond the annual 6 per cent or beyond $25 per share in the event of liquidation. It was to be without preemptive rights, to be cumulative from January 1, 1936, but not prior thereto, and was to be callable at par upon 10 days' notice at the option of New Bryant. All of the common stock was to be issued to Dresser at the stated price of $1 per share, while the preferred shares, equivalent in number to the issued and paid up common shares of Old Bryant, were to be given to Old Bryant in exchange for its net assets and good will. Old Bryant was then to dissolve and distribute the preferred shares in New Bryant to Old Bryant's stockholders. In addition, New Bryant was to execute its promissory note to Dresser in an amount equal to what Dresser was to pay in cash to acquire the dealers' notes on which Old Bryant, the original payee, was contingently liable as endorser, whereupon Dresser would turn over the notes to New Bryant. The face amount of these notes on May 26, 1933 was $257,424.50. On July 1, 1933, Dresser *55 transferred to New Bryant all the dealers' notes which it had purchased from the conservator and which, on that date, had an aggregate face value of $254,340. In return, Dresser received a promissory note of New Bryant in the amount of $65,000 due on July 1, 1938. After New Bryant was formed, two-thirds of the total indebtedness of approximately $290,000, including the dealer notes, owed by the dealers to New Bryant was forgiven and new notes in the total amount of one-third of the former liability were executed. Liability on these new notes was deferred for a 2-year period. The agreement was put into effect at the close of business on June 30, 1933. New Bryant had been incorporated on June 22, 1933, under the laws of Ohio. All its common stock, consisting of 500 shares of nopar value stock, was issued by Dresser for $500. At the close of business on June 30, 1933, Old Bryant transferred to New Bryant all its assets, subject to its stated liabilities, and in return received all the preferred stock of New Bryant in the amount of 4,282 shares, which Old Bryant later distributed share for share to its shareholders in complete liquidation and dissolution of Old Bryant. No dividends *56 could be declared or paid on the common stock in any calendar year prior to the calendar year 1936 until the annual dividend was declared and paid in that year on the preferred stock. This transaction was arrived at by arm's length bargaining of the parties thereto. Old Bryant was seeking to obtain the best terms possible for its assets on the open market, regardless of the identity of the person interested. Upon taking over the properties of Old Bryant, New Bryant made numerous adjusting entries to the closing balance sheet of the old company to arrive at the opening balance sheet of the new company. These adjustments were entitled "Decrease in Assets July 1, 1933" on a schedule attached to New Bryant's income tax return for the short taxable period July 1, 1933 to December 31, 1933. As adjusted, the balance sheet of New Bryant on July 1, 1933, was as follows: "Assets
Cash
$ 14,182.71
Notes and Accounts Receivable
(Net)
132,533.57
Merchandise Inventory
145,007.36
Stock of Domestic Corporation
10,820.65
Fixed Assets (Net)
423,298.64
Patents
1.00
Good Will
Cash Surrender Value of In-
surance
200.00
Prepaid Insurance & Expenses
5,314.34
Patterns (Net)
14,649.02
Supplies
3,765.23
Total Assets
$749,772.52
Liabilities
Notes Payable
$ 90,000.00
Accounts Payable
23,734.70
Accrued Taxes
8,716.82
Total Liabilities
$122,451.52
Reserve for Receivables
$ 38,271.81
Reserve for Investments
820.48
Reserve for Inventory Adjust-
ment
30,000.00
Capital
Preferred stock ( $25 par)
107,050.00
Common (No par)
100,000.00
Surplus
351,178.71
$749,772.52"
*57 The book value of the fixed assets appearing on New Bryant's opening balance sheet was not written down but was taken over directly from Old Bryant's books. At all times during the first 6 months of 1933, Old Bryant was a going concern as was New Bryant on July 1, 1933. On July 1, 1933, at the conclusion of the transactions described above, the assets and business of New Bryant were identical to the assets and business of Old Bryant immediately before the transaction, except for the $500 paid by Dresser for the common stock of New Bryant. The liabilities of New Bryant were also identical to the liabilities of Old Bryant, except that a $65,000 promissory note to Dresser had been substituted for Old Bryant's obligation to Union Trust as endorser on the dealers' notes. The net income (or loss), net sales and book net worth by taxable years from 1912 to June 30, 1933, of Old Bryant, insofar as such information is available, were as follows: Net
Net
Net
Year
Income
Sales
Worth
1912
$ 8,007
1913
23,643
1914
1915
51,636
1916
57,927
1917
60,996
1918
1919
6,767
1920
34,453
1921
(52,438)
1922
35,074
$ 295,363
$ 186,172
1923
78,568
420,223
259,887
1924
62,791
501,007
260,140
1925
107,610
730,458
573,780
1926
352,859
1,243,165
779,949
1927
159,882
1,378,838
888,132
1928
141,827
1,405,617
955,825
1929
248,099
1,766,064
861,636
1930
159,059
1,512,130
1,156,539
1931
$ (2,657)
$ 869,906
$1,069,714
1932
(197,893)
281,107
881,743
1st 6 mos.
- 1933
(54,055)
67,333
730,480
*58 The net income (or loss), net sales and book net worth by taxable years from July 1, 1933 to December 31, 1939 of New Bryant were as follows: Net
Net
Net
Year
Income
Sales
Worth
July 1, 1933 to
Dec. 31, 1933
($ 44,489)
$ 221,229
$ 542,467
1934
11,356
492,153
555,060
1935
(55,334)
655,396
478,335
1936
136,303
1,464,615
483,389
1937
38,842
1,897,495
485,745
1938
15,594
1,435,009
381,506
1939
108,555
1,856,093
1,153,631
The year-end balances of loans from Dresser to New Bryant were as follows: December 31, 1933
$115,000
December 31, 1934
195,000
December 31, 1935
200,000
December 31, 1936
555,000
December 31, 1937
725,000
December 31, 1938
695,000
The fair market value of the fixed assets of New Bryant was not less than $130,000. The total liabilities of New Bryant as of July 1, 1933, were $122,451.52. In the spring of 1933, B. A. Hendrickson, a stockholder of Old Bryant, was personally indebted to Union Trust on a loan which was secured by 200 shares of Old Bryant common stock. This loan had become overdue by February 1933. If a reorganization were pending that would result in the substitution *59 of different securities as collateral, the normal practices of the bank would have been to look into the matter to see that they received the best replacement collateral. No objection was made by it to the reorganization of Old Bryant. The stock pledged by Hendrickson on this loan was voted in favor of the reorganization by a proxy. In the spring of 1933, Hendrickson was also personally indebted to The Cleveland Trust Company on a loan which was originally secured by 400 shares of Old Bryant common stock. This collateral was later increased to 800 shares. The loan was in default in May 1933. The normal practice of the bank would have been to analyze the collateral and, if a reorganization were proposed, to investigate the merits thereof to see that the new proposed securities would represent equivalent collateral. The Cleveland Trust Company did not object to the reorganization of Old Bryant. The stock pledged by Hendrickson on this loan was also voted in favor of the reorganization, by the same proxy. There was nothing introduced in the course of the transfer itself, nor immediately after the transfer which added value to New Bryant. Subsequently, new management was introduced, *60 the line of products was expanded and substantial working capital in the form of loans was acquired. The fair market value of New Bryant on July 1, 1933 was not in excess of $200,000. On July 1, 1933 the fair market value of the aggregate outstanding preferred stock of New Bryant exceeded the aggregate fair market value of the common stock of New Bryant. Immediately after the transfer on July 1, 1933 the acquisition by the stockholders of Old Bryant of preferred stock in New Bryant gave them an interest of more than 50 per cent in New Bryant. In its tax returns for the years starting with 1933 through its return for its final period, New Bryant consistently computed depreciation by using Old Bryant's basis for the assets acquired from that company. On January 1, 1940, New Bryant redeemed all its outstanding preferred stock and thereafter became and remained a wholly-owned subsidiary of Dresser. By an agreement dated January 5, 1949, New Bryant sold all its assets, subject to liabilities, for $6,100,000, as of January 1, 1949, to Affiliated Gas Equipment, Inc., hereinafter called Affiliated, a corporation newly formed for the purpose of acquiring such assets. The equity *61 capital of Affiliated was secured by a public issue of its securities. The parties to the negotiations which resulted in this sale were New Bryant, Affiliated, the underwriters of Affiliated's original stock issue, and certain insurance companies who were loaning money to Affiliated. The fair market value of all assets other than inventories and fixed assets sold by New Bryant to Affiliated was equal to their adjusted tax basis. On its income tax return for the period November 1, 1948 to February 28, 1949, New Bryant reported its profit on the sale of its business as being $243,761.96. Because of certain concessions the petitioners now contend the profit to be $256,655.28. Respondent in his statutory notice redetermined the profit to be $524,773.05. Respondent now concedes the profit to have been not more than $457,955.63. The manner in which the profit is computed in accordance with the contentions of the respective parties is shown in the columns below as follows: Petitioners'
Respondent's
Contention
Contention
Assets: Cash
$ 500,543.27
$ 500,543.27
Accounts receivable - Trade (Net)
1,447,211.95
1,447,211.95
Accounts receivable, Affiliated Companies
400,355.56
400,355.56
Inventories
3,719,133.67
3,719,133.67
Miscellaneous receivables
11,368.03
11,368.03
Claims for refund
24,497.16
24,497.16
Capital assets: Land
100,350.00
32,419.09
Buildings
400,637.35
185,025.90
Machinery and equipment
1,755,756.96
1,755,756.96
Emergency facilities
35,403.68
35,403.68
Total
$2,292,147.99
$2,008,605.63
Less: Depreciation
Reserve for buildings
$ 184,735.79
* $ 102,493.78
Reserve for machinery and equipment
677,755.66
677,755.66
Reserve for emergency facilities
35,403.68
35,403.68
Total
$ 897,895.13
$ 815,653.12
Deferred charges: Prepaid miscellaneous items
$ 93,256.84
$ 93,256.84
Unamortized cost of patents
19,490.23
19,490.23
Unamortized pension expense
0
0
Total
$7,610,109.57
$7,408,809.22
Total liabilities
$1,766,764.85
$1,766,764.85
Purchase price paid by Affiliated
6,100,000.00
6,100,000.00
Total purchase price and liabilities assumed
by Affiliated
$7,866,764.85
$7,866,764.85
Total assets sold
7,610,109.57
7,408.809.22
Profit on sale of assets
$ 256,655.28
$ 457,955.63
*62 The constituent parts of the total inventories of New Bryant shown above were as follows: Finished products
$ 933,220.51
Work in process
1,955,471.60
Raw materials and supplies
830,441.56
$3,719,133.67
Petitioners reported the entire profit as a long-term capital gain. Respondent allocated the profit proportionately between capital assets and inventories according to their respective adjusted bases, treating the resulting profit from inventories as ordinary income and the profit from capital assets as long-term capital gain.
Petitioners have not shown the relative fair market value of New Bryant's capital assets and inventories as of the date of the sale to Affiliated. The sales price of the fixed assets and inventories was equivalent to the fair market value of each which was in accordance with their respective book values at the time of sale. As of February 15, 1949, the date of New Bryant's dissolution, the State of Ohio claimed that New *63 Bryant was indebted to it for sales and use taxes covering the period from July 1, 1946 through December 31, 1948. This liability was disputed by the directors of New Bryant as well as by Dresser, as transferee. The contested liability was settled by payment of $9,331.88 to the State of Ohio by Dresser, as transferee on April 10 and October 26, 1951. On February 15, 1949, New Bryant was indebted to the State of Illinois for property taxes in the amount of $1,265.08, representing taxes for the year 1948. These taxes were paid as of February 15, 1949 by Affiliated on behalf of Dresser, as transferee of New Bryant. Affiliated was subsequently reimbursed for that amount by Dresser. On February 15, 1949, New Bryant owed the State of New Jersey for unemployment taxes for the years 1946, 1947 and 1948 the amount of $1,975.50, together with interest thereon. These taxes were paid, together with interest in the amount of $175.19 on or about June 8, 1949 by Affiliated on behalf of Dresser, as transferee of New Bryant. Affiliated was reimbursed for that amount by Dresser. None of the taxes described above have ever been allowed as deductions to New Bryant. New Bryant incurred organizational *64 expenses at the time of its organization in 1933 as follows: Legal fees paid in the amount of $4,013.55, and other organizational expenses in the amount of $133. These expenses and fees have never been taken by petitioner or allowed by respondent as a deduction. Under the terms of the agreement of sale between New Bryant and Affiliated the former company agreed to dissolve and liquidate. On February 15, 1949, New Bryant was dissolved and liquidated into Dresser, pursuant to the applicable Ohio statutes and section 112(b)(6) of the Internal Revenue Code of 1939. Opinion I. The first question involves the correct basis for computing petitioner's gain [1] on the sale of its assets in the year before us. Petitioner urges that since the transaction by which they were acquired in 1933 was a reorganization, the assets are covered by the carry-over basis provided in section 113(a)(7), the transferor or its stockholders having retained at least a 50 per cent "interest." [2] Respondent denies that, in fact, the interest amounted to as much as 50 per cent and therefore insists that petitioner's basis is cost to it. The parties are apparently in agreement that the old stockholders did not *65 retain any "control" but that the transaction in question was a "reorganization" and that a 50 per cent "interest" even though composed exclusively of preferred stock would meet the requirements of section 113(a)(7). See Schweitzer & Conrad, Inc., 41 B.T.A. 533. The sole controversy, as the case is presented, is accordingly whether "immediately after the transfer" the preferred stockholders, who were the holders of the common stock of the old company, held an interest of 50 per cent or more in the new. *66 The many obscure and possibly conflicting cases dealing with relative valuations [3] can be reconciled at least for purposes of the present proceeding by concentrating on the fact that the preferred stock had an interest of $25.00 a share in the new corporation. This is so whether we consider priority of that stock on liquidation, its call price, or the long-term preferential and cumulative rate of return of 6 per cent on the par value in that amount. [4] It follows that without regard to the fair market value of either preferred or common stock, if the equity of all stockholders in the new corporation whether as a conglomeration of assets or as a going business - in other words their "interest" in the corporation - was less than twice the aggregate of the preferred stock, the holders of the latter had an interest of 50 per cent or more. Since the preferred stockholders were, in effect, the transferors, petitioner would then be entitled under section 113(a)(7) to its predecessor's basis. *67 The parties are somewhat at odds whether valuation of the new company "immediately after the transfer" should be on a basis of asset value or viewed as a going concern. To us the problem seems academic since from either point of view the result is sufficiently similar. Although without support in the position of the parties, the circumstances are such as to persuade us of the probability that break-up value was as good or perhaps better than going concern value at the time. Although the total income for the 6 preceding calendar years shown by the record [5] superficially appears to have been in the neighborhood of $300,000 (after offsetting net losses in some years against net income in others) the fact is that some $218,000 of accounts receivable, presumably taken up in income during this time, were discovered to be worthless and had to be written off at the time of the reorganization. The apparent income during these 6 years was hence largely illusory. An investor looking at the situation as of July 1, 1933 could not but take into account that the average annual true income over the preceding period, including the prosperous years of 1927 through 1929, was roughly $13,000. Projecting *68 that return into the future and subtracting preferred dividends of some $6,000 would hence leave prospective gross earnings available for the common stock of some $7,000 a year. [6] Capitalizing this at 10 per cent - a conservative figure for such a business in such a period - and adding the preferred stock leaves a going concern value of some $177,000. The pro forma balance sheets of New Bryant set forth in our *69 findings would likewise be adjusted by a prospective investor in a number of ways, several of which are inferentially conceded by respondent. [7] Briefly stated, the best that can be said is that it appears as though the value of the assets taken separately might, after deducting liabilities, be as high as $265,000. Included in this figure, however, is net merchandise inventory of $115,000 and patterns of almost $15,000. Certainly it is reasonable to assume that if the assets were to be sold piecemeal, these figures would have to be discounted sharply, probably by at least one-half. For obvious reasons good will, trade name, and probably patents would under such circumstances have a negligible, if any, value. Without allowing any deduction for costs of liquidation or operating expenses while it was in progress, it could only be by a stretching of the figures that the break-up value could approach $200,000. For the reasons stated, and considering all the evidence *70 in the record we have, accordingly, made the findings of fact that the new corporation, whether as a going concern or as a collection of assets, had a value not in excess of $200,000 on the critical date. Without invoking the assumption that arm's length bargaining may be relied on as approximating the relative true values, Taylor-Wharton Iron & Steel Co., 5 T.C. 768; Montgomery Building Realty Co., 7 T.C. 417; Bessemer Limestone & Cement Co., 22 T.C. 303 (May 14, 1954); see 3 Mertens "Law of Federal Income Taxation" 167, 168, the conclusion thus follows that the preferred stock at a figure of $107,050 represented an interest in excess of 50 per cent of the total. II. Having determined the basis, the amount and character of the gain depends further on whether respondent correctly allocated a portion of the selling price between fixed assets and inventory. If there was a gain on the latter the parties are apparently agreed that it is taxable as ordinary income. But petitioner contends that whatever profit was realized came from the other assets and not from the inventories from which in fact it sustained a loss. Respondent's determination, *71 which we must of course regard as prima facie correct, is based on the assumption that fair market value and therefore selling price of the two classes of assets was proportionate to their book value. Aside from the usual burden of proof this position is also supported by such cases as B. F. Edwards, 39 B.T.A. 735, to the effect that book value is some evidence of fair market value shifting the burden of going forward. Since we are not satisfied that petitioner's opinion evidence [8] sustained either of these burdens, see Violet Newton, 12 T.C. 204, we have found as a fact that the relative sales prices of the two sets of assets were in proportion to the book figures. Respondent having employed petitioner's cost rather than its predecessor's basis, the amounts determined by him require adjustment but the necessary figures have apparently been agreed upon and may be taken into account in the recomputation. *72 III. Petitioner seeks to deduct in the year of its "dissolution" the organization expenses incurred by New Bryant when it was formed in 1933 relying on the rule enounced in Malta Temple Association, 16 B.T.A. The question is whether this situation is more like the complete and irrevocable dissolution in the Malta Temple case or the merger which took place in Citizens Trust Co., 20 BTA 392, 393, 394, where no deduction for original organization expenses was allowed. In the latter case, notwithstanding that the petitioner there "was absorbed by merger * * * by the Marine Trust Co." and "the corporate activities of the two institutions were continued under the corporate name and identity of the Marine Trust Co. * * *" and there was no survival of the "indicia and attributes of a corporate body distinct from that into which it is merged" we held that at that time petitioner's organization expenses did not represent a loss and could not be deducted. Here it is stipulated not only that petitioner was "liquidated and dissolved into Dresser" but that the transaction was one in which gain or loss are not recognized under the provisions of section 112(b)(6).since the theory of *73 the latter section is that because of the continued nature of the operation no tax-determining transaction has taken place, [9] the situation seems to us more nearly subject to the Citizens Trust Co. doctrine than that of Malta Temple. We conclude that whatever may be the case if and when Dresser ultimately discontinues its business, but see Motion Pictures Capital Corporation, 32 B.T.A. 339, affd. (C.A. 2) 80 Fed. (2d) 872, no identifiable event took place in the years before us fixing an economic loss for which petitioner should be permitted a deduction.
IV. Three sets of taxes are claimed as deductions. The applicable law stemming as it does from Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, *74 is the same although the results will differ. A. Taxes were due for 1948 to the State of Illinois. The evidence sustains petitioner's contention that the taxes were due and accrued under Illinois law on April 1st of that year. The taxes were for the year 1948 and although not actually accrued by the petitioner were not contested and were evidently subject to accrual in that year. G.C.M. 6273, VIII-1 C.B. 168. Respondent's contention that they could not be deducted in 1949 because petitioner's dissolution took place before April 1st is consequently irrelevant. We conclude that respondent erred in this respect. B. Taxes payable to the State of New Jersey fall into a different category. Petitioner concedes that "The record does not disclose the proportionate amount of the total which is applicable to the" periods November 1, 1948 to February 28, 1949 and the taxable year ending October 31, 1948. Some part is apparently conceded to be attributable to the taxable year ending October 31, 1947 which is not before us. It is accordingly impossible to find from the record as it now stands that petitioner is entitled to the deduction of any specific amount as taxes due to the *75 State of New Jersey for the periods in controversy here. Petitioner suggests that an agreement may be reached in the recomputation and of course if this is done the resulting figures will then be taken into account. But no determination can now be made sustaining petitioner's contention. C. Similarly, with respect to taxes in the amount of $9,331.88 paid in a subsequent year by petitioner's successor-transferee after a contest, the record is inadequate to determine what part if any of these taxes were due for the years in issue. Petitioner's position for which it is unable to cite authority appears to be that items in dispute at the time of dissolution are accruable in that year regardless of when they became settled. The contention is derived from two premises both of which appear to be highly questionable. The first is that if not deducted in the year of dissolution they will not later be deductible. Corporations continue to exist for the purpose of collecting assets and paying obligations. Fairfield S.S. Corp. v. Commissioner, (C.A. 2) 157 Fed. (2d) 321, certiorari denied 329 U.S. 774; Section 1701.87, Revised Code of Ohio. If this item is deductible *76 in the year of settlement we see no reason why it would not then be deductible by the representative of the dissolved corporation. And even the assumption that there will then be no income against which to offset it is purely gratuitous since it would frequently be possible that the same process of paying debts would be accompanied by collections sufficiently doubtful to be taken up in income only at that time. In this case we have no knowledge of the actual situation but in any event the year of payment is not before us. All of this is without respect to the question of the rights if any which petitioner's successor-transferee might likewise have had or claimed with respect to the identical deductions in the year of settlement and as to which it is for obvious reasons unnecessary to express an opinion. In the second place, it is by no means clear that the taxes in question were being contested in the years for which they were payable and under these circumstances there is at least substantial doubt as to whether they would not have been accruable at that time in any event. See Clifton Manufacturing Co., 1 T.C. 71, revd. (C.A. 4) 137 Fed. (2d) 290. Be *77 all that as it may, the fact is that we have insufficient evidence to determine that any of these taxes were accruable in either of the tax periods before us. As in the case of the New Jersey taxes no part of the claim may be allowed except to the extent that the parties may be able to reach an agreement in the recomputation. Decisions will be entered under Rule 50. Footnotes
*. ↩
Reserve for depreciation on Buildings
$109,967.78
Adjustment due to Public Law 593 for taxable years 1933
and 1935 which were loss years
7,474.00
Net reserve for buildings
$102,493.78
1. Depreciation allowable up to the time of sale is apparently also in issue. ↩
2. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(7) Transfers to Corporation. - If the property was acquired - (A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, * * * Then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *↩
3. E.g., Republic Steel Corp. v. United States, 86 Fed. Supp. 146 (Ct. Cls. 1949), certiorari denied 340 U.S. 815; Four Twelve West Sixth Co., 7 TC. 26; C. D. Johnson Lumber Corporation, 12 T.C. 348; United Carbon Co. v. Commissioner, (C.A. 4) 90 Fed. (2d) 43↩. 4. Once the preferred stock is thought of as having a lesser interest than this, the value of the entire corporation decreases to that of the preferred stock since the common stock interest would have become nominal and virtually disappear.↩
5. Actually 5 1/2 years to July 1, 1933. Doubling the loss for the first half of 1933 would of course make the average look worse. ↩
6. Confirming this forecast the new company lost $110,000 in the first 2 1/2 years of its operation, made a net profit, presumably before preferred dividends, of as much as $11,000 in only 1 of these years, and in the 6 calendar years through 1938 actually averaged a net income of only about $16,000 annually after offsetting the net losses of some years against the net income of others. During that time, as our findings show, sums greatly in excess of its entire net worth were loaned by the common stockholder to the new company, while its net worth actually decreased by a sum in excess of $96,000 during the last 3 years in that period.↩
7. Thus we have found, at respondent's request, that the fair market value of the fixed assets was "not less than $130,000" - although they were carried on New Bryant's books at almost 3 times that figure on July 1, 1933.↩
8. E.g., at one point in his brief petitioner relies on the testimony of one of the negotiators to the effect that "* * * the value of the inventories was whatever the value was on the books of the company." Yet at another point petitioner insists that "* * * It now appears from the evidence, however, that at the time of the transfer, the inventories were worth $131,161.21 less than book value * * *" The only conclusion is that the opinion of the negotiators as to value had little relationship on petitioner's own statement to the actual market value of the respective assets; if it could be that the values were higher it could equally be that they were lower.↩
9. "* * * Section 112, as a whole, provides for the suspension of what would otherwise be immediately 'realized' gains or losses; it has its reason and its justification in the fact that the expected transfers are of a kind' which do not result in substantial changes of interest, and that the original business is to go along as before. * * *" Judge Learned Hand in Fairfield S.S. Corp. v. Commissioner, (C.A. 2) 157 Fed. (2d) 321, 323↩, certiorari denied 329, U.S. 774.